Richard E. Ayres
Jessica L. Olson
John H. Bernetich
AYRES LAW GROUP LLP
1707 L St. NW, Suite 850
Washington, DC 20036
Ph: (202) 452-9200 / Fax: (202) 872-7739
ayresr@ayreslawgroup.com
olsonj@ayreslawgroup.com
bernetichj@ayreslawgroup.com
*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WESTERN ORGANIZATION OF RESOURCE COUNCILS and FRIENDS OF THE EARTH, | ) ) ) ) |
| *Plaintiffs,* | ) **Case No. 1:14-cv-1993-RBW** |
| v. | ) ) |
| SALLY JEWELL, in her capacity as Secretary of the Interior, DEPARTMENT OF THE INTERIOR, NEIL KORNZE, in his capacity as Director, Bureau of Land Management, BUREAU OF LAND MANAGEMENT, | ) ) ) ) ) ) |
| *Defendants.* | ) |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO
## FEDERAL DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

LEGAL BACKGROUND......................................................................................................3

    A.   National Environmental Policy Act................................................................................3

    B.   Administrative Procedure Act .......................................................................................4

STANDARD OF REVIEW....................................................................................................5

ARGUMENT ..........................................................................................................................6

    I.   Defendants Have a Discrete Mandatory Duty to Supplement the 1979 PEIS. .......6

    A.   NEPA Requires Supplementation of an EIS if Environmentally Significant
Government Action Remains to be Taken in the Program.................................................6

    B.   The Cases Cited by Defendants Demonstrate that Defendants Have a Discrete
Mandatory Duty to Supplement the 1979 PEIS. .................................................................9

    C.   The Federal Coal Management Program is a Continuing Federal Action Subject to
NEPA's Obligations. .........................................................................................................14

        i.   Plaintiffs Have Alleged Sufficient Facts to Establish that the Federal Coal Management
Program is a Continuing Major Federal Action Standing On Its Own. ....................................14

        ii.   The 1979 PEIS Analyzes the Environmental Impacts of Activities to be Conducted Under
the Coal Management Program, Rather Than Simply a Procedural Rulemaking.....................15

    D.   Plaintiffs Have Adequately Alleged that Sufficient Government Action Remains to
Require Supplementation of the 1979 PEIS.....................................................................17

    E.   Plaintiffs Have Adequately Alleged that the Increased Understanding of Global
Warming and the Effects on Global Warming of the Federal Coal Management Program
is New and Significant Information. .................................................................................18

    II.   Defendants' Failure to Supplement the 1979 PEIS is Final Agency Action
Reviewable Under the Administrative Procedure Act. .................................................20

CONCLUSION .....................................................................................................................21

**INTRODUCTION**

The federal government's program to lease the right to mine coal on federal land, administered by Defendants under substantially the same regulatory procedures in place since 1979, results in emissions of nearly a billion tons of carbon dioxide and other greenhouse gases annually, making the U.S. Department of the Interior's Bureau of Land Management (BLM) among the handful of institutions on Earth most responsible for emissions of greenhouse gases into the atmosphere. Compl. ¶ 101, Dkt. 1. The program currently manages 309 leases in 10 states, *id.* ¶ 4, and continues to issue leases and lease modifications today, opening up billions of tons of coal resources to development.

In 1979, BLM's Programmatic Environmental Impact Statement for the federal coal management program ("Program") barely mentioned the effects of greenhouse gases emitted from coal combustion. Bureau of Land Management, Final Environmental Statement: Federal Coal Management Program (Apr. 1979) ("1979 PEIS").  Since the 1979 PEIS was prepared highly significant new information and data have become available and conditions have arisen that bear on the disruptive effects of the use of coal on human health and on the Earth's climate. Just five years ago, the Environmental Protection Agency (EPA) made an official finding under the Clean Air Act that rising concentrations of carbon dioxide and other greenhouse gases endanger public health and the environment. EPA Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496 (Dec. 15, 2009).

Regulations of the President's Council on Environmental Quality (CEQ) arising from the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* (NEPA), require that a PEIS be supplemented whenever there are "significant new circumstances or information relevant to

environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(ii).

The Complaint alleges that the continued BLM failure to reassess the environmental impact of the significant new information on greenhouse gas emissions in a supplemental PEIS constitutes agency "action unlawfully withheld or unreasonably delayed" under the Administrative Procedure Act, 5 U.S.C. § 706(1).  Taking the facts alleged by Plaintiffs as true, the Complaint establishes that the BLM cannot continue to operate the Program without supplementing its outdated 1979 PEIS for the Program.

Defendants' Corrected Motion to Dismiss should be denied for two reasons. First, the standard of review for a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) does not permit the court to reconcile competing factual allegations advanced by the parties. In an effort to demonstrate it is not under a duty to supplement the 1979 PEIS, Defendants dispute the facts alleged in the Complaint and offer their own facts. But the standard of review requires the court to take all the facts alleged in the Complaint as true and draw all reasonable inferences therefrom. Under this standard, Plaintiffs have sufficiently supported their claim that the failure to supplement the 1979 PEIS is action unreasonably withheld. In the Complaint and accompanying Declarations, Plaintiffs have shown that since the issuance of the 1979 PEIS prepared for BLM's Program, scientific understanding of global warming and its causes and effects has grown from an untested hypothesis to hard science accepted by the global scientific community. Compl. ¶¶ 102-81; *see generally* Declaration of Michael C. MacCracken, Attachment 1 to Compl.; Declaration of Stephen Dycus, Attachment 2 to Compl. Despite these facts, adequately alleged in the Complaint, Defendants have failed to conduct an updated analysis of the Program's environmental impacts as required by NEPA.

Second, Defendants' Motion to Dismiss should be denied because it argues the crabbed view that because the 1979 PEIS evaluated a program that included a proposed regulation, any obligations under NEPA ceased when that regulation was adopted. But the federal coal management program analyzed in the PEIS and established in those regulations, which has grown to account for 40% of the entire U.S. production of coal, continues to this day. The relevant statute, regulations, and case law require federal agencies administering such continuing programs to supplement an EIS or PEIS when significant new information or changed circumstances occur. *See, e.g.*, 40 C.F.R. 1502.9(c)(ii); *Marsh v. Ore. Natural Res. Council*, 490 U.S. 360, 371-72 (1989); Exec. Order No. 11514, 35 Fed. Reg. 4,247 (Mar. 7, 1970).

The Court should deny Defendants' Corrected Motion to Dismiss because Defendants impermissibly challenge the Complaint's allegations regarding the existence of an ongoing major federal action subject to NEPA, and because Defendants ignore or misconstrue case law providing that the mandatory duty to supplement an EIS applies when there remains significant federal action to occur in a program.

## LEGAL BACKGROUND

A.    National Environmental Policy Act

NEPA is the "basic national charter" for environmental protection. 40 C.F.R. § 1500.1(a). Rather than mandating a particular substantive environmental result, NEPA works "by focusing Government and public attention on the environmental effects of proposed agency action." *Marsh*, 490 U.S. at 371. The heart of NEPA is its requirement that agencies prepare an environmental impact statement before undertaking a "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Among other requirements, the EIS must address the action's environmental impact, including "reasonably

3

foreseeable" effects that are direct, indirect, or cumulative. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.7, 1508.8, 1508.25.

Environmental impacts of a "national program" are to be addressed in a program-level EIS, also called a programmatic EIS or PEIS. 40 C.F.R. § 1508.28. Preparation of a PEIS is appropriate where the major federal action under analysis is a program made up of numerous project-level actions. *Id.* A PEIS differs in scope from a project-level EIS in that a PEIS analyzes the broad environmental impacts of the program at large; a project-level analysis focuses on impacts from a site-specific project.

CEQ regulations implementing NEPA provide that agencies "[s]hall prepare supplements to either draft or final [EISs] if . . . [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(ii). CEQ was created by NEPA and implements the Act through its regulations. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).

B.      Administrative Procedure Act

The Administrative Procedure Act, 5 U.S.C. § 706(1), provides a cause of action for plaintiffs seeking to "compel agency action unlawfully withheld or unreasonably delayed." Section 706(2) allows a court to "set aside agency action" in certain enumerated circumstances. 5 U.S.C. § 706(2). The APA defines "agency action to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or *failure to act*." 5 U.S.C. § 551(13) (emphasis supplied); 5 U.S.C. § 701(b)(2). Courts have found that this definition is expansive. *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19-20 (D.C. Cir. 2006) (internal citations omitted) (noting that "agency action" as defined by §

551(13) is "meant to cover comprehensively every manner in which an agency may exercise its power").[1]

## STANDARD OF REVIEW

In review of a motion to dismiss for failure to state a claim for relief under Fed. R. Civ. P. 12(b)(6), the court "must treat the complaint's factual allegations as true, and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000). "A plaintiff's complaint need only provide 'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to survive a motion to dismiss." *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (quoting Fed. R. Civ. P. 8(a)(2)). A complaint must give the defendants notice of the claims and the grounds upon which they rest. *Erickson v. Pardus,* 551 U.S. 89, 93 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quotations and citations omitted).

---

[1] Defendants erroneously argue that Plaintiffs have not stated a claim under § 706(2) because the complaint does not identify an affirmative agency action. Courts have held that claims challenging agency inaction may be brought under either § 706(1) or § 706(2) since § 706 offers similar relief under both sections. In reviewing § 706 claims, courts examine whether, assuming there exists a mandatory duty for the agency to act in the case of a § 706(1) claim, the agency acted or failed to act in a way that was arbitrary or capricious. *See N.A.A.C.P. v. Sec'y of Hous. & Urban Dev.*, 817 F.2d 149, 160 (1st Cir. 1987) (Breyer, J.) (finding unpersuasive the federal defendant's argument that § 706(2) was inapplicable because the plaintiff did not seek to "set aside" any particular agency action). The First Circuit in *N.A.A.C.P.* explained that, "One can … reasonably view the NAACP's suit as one to 'set aside' HUD's practice, which practice reflects an 'abuse' of HUD's 'discretion.' This view is consistent with the statute. The APA defines 'agency action' to include 'failure to act.' 5 U.S.C. § 551(13)."

In considering a motion under Rule 12(b)(6), a "court must assess the legal feasibility of the complaint, but may not weigh the evidence that might be offered to support it." *Howard v. Office of Chief Admin. Officer of U.S. House of Representatives*, 720 F.3d 939, 950 (D.C. Cir. 2013) (internal quotation marks and alterations omitted). A court may not grant a motion to dismiss for failure to state a claim "even if it strikes a savvy judge that . . . recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 (2007) (internal quotation marks and citation omitted). "So long as the pleadings suggest a 'plausible' scenario to 'sho[w] that the pleader is entitled to relief,' a court may not dismiss." *Tooley v. Napolitano,* 556 F.3d 836, 839 (D.C. Cir. 2009) (quoting *Twombly,* 550 U.S. at 557).

## ARGUMENT

Accepting Plaintiffs' factual allegations as true, Plaintiffs have stated a claim under NEPA and the APA that (1) Defendants have a discrete mandatory duty to supplement the 1979 PEIS, and (2) Defendants' failure to undertake that duty is reviewable under the APA. Accordingly, Defendants' Corrected Motion to Dismiss should be denied.

**I.      Defendants Have a Discrete Mandatory Duty to Supplement the 1979 PEIS.**

A.      NEPA Requires Supplementation of an EIS if Environmentally Significant Government Action Remains to be Taken in the Program.

Agencies must supplement a completed EIS where there is new information and the remaining government action would have significant environmental effects. 40 C.F.R. § 1502.9(c)(ii). NEPA's requirement that agencies must supplement a final EIS in the face of new information or circumstances serves to buttress NEPA's primary objective that agencies take a "hard look" at the environmental effects of a federal action before taking that action. In *Marsh*, the Supreme Court noted that "[i]t would be incongruous with [NEPA's] approach to environmental protection, and with the Act's manifest concern with preventing uninformed

action, for the blinders to adverse environmental effects, once unequivocally removed, to be restored prior to the completion of agency action simply because the relevant proposal has received initial approval." 490 U.S. at 371. The Court recognized that "it would make sense to hold NEPA inapplicable at some point in the life of a project, because the agency would no longer have a meaningful opportunity to weigh the benefits of the project versus the detrimental effects on the environment." *Id.* at 371-72. But "up to that point, NEPA cases have generally required agencies to file environmental impact statements when the remaining governmental action would be *environmentally significant*." *Id.* at 372 (internal quotation marks omitted) (emphasis supplied). Thus, where the remaining governmental action would be environmentally significant and there is significant new information or circumstances bearing on the impacts of the federal action, NEPA requires that a final EIS be supplemented. *Id.*; 40 C.F.R. § 1502.9(c)(ii). This duty is mandatory and non-discretionary. *See* 40 C.F.R. § 1502.9(c) (mandating supplementation); *Marsh*, 490 U.S. at 372 (deferring to regulation).

The duty to supplement an EIS applies to ongoing federal actions made up of discrete, smaller, project-level actions, such as decisions to lease federal coal. In *Friends of the Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000), the court was confronted with whether the Forest Service was required to supplement a 1987 PEIS for a forest plan prepared for a National Forest. A number of timber sales had been conducted in accordance with the forest plan. Eleven years after the issuance of the PEIS, plaintiffs sought a supplemental EIS based on recent listings of species under the Endangered Species Act. *Id.* at 555. The court held that because timber sales continued to be issued in accordance with the forest plan, NEPA's duty to supplement applied. *Id.* at 558-59. The court admonished the agency for failing to satisfy its duty to ensure compliance with NEPA: "The agency must be alert to new information that may alter the results

of its original environmental analysis, and continue to take a 'hard look at the environmental

effects of [its] planned action'" so long as "'there remains major Federal action to occur.'" *Id.* at

557-58 (quoting *Marsh*, 490 U.S. at 374). The federal action in *Friends of the Clearwater,* timber

sales pursuant to a forest plan, is analogous to the present case where BLM continues to lease

coal pursuant to its Program.

Defendants erroneously argue that Plaintiffs would not be without relief if BLM fails to

supplement the PEIS, citing the opportunity to challenge each individual EIS for site-specific

lease applications. Motion at 12 n.3. Defendants misapprehend the application of NEPA to

agency programs. In *National Wildlife Federation v. Appalachian Regional Commission*, 677

F.2d 883 (D.C. Cir. 1981), the D.C. Circuit squarely addressed whether a federal program for

which a programmatic EIS had been prepared, is itself an ongoing major federal action subject to

NEPA's obligations, even though the program is made up of similar but separate federal actions,

each subject to a site-specific EIS. The court answered this question affirmatively, and held that

such programs are subject to NEPA's obligations. 677 F.2d at 888.

Clarifying this concept further, *Friends of the Clearwater* and *Appalachian Regional*

*Commission* established two incontrovertible principles that apply to this case: first, where an

agency establishes a program made up of similar but separate major federal actions, such as the

federal coal management program, and the agency prepares a programmatic EIS at the

commencement of that program, such as the 1979 PEIS, that program is itself an ongoing major

federal action subject to NEPA obligations; and second, NEPA's duty to supplement an already

prepared EIS continues to apply to ongoing major federal actions up to the point where agency

decisionmaking could no longer be informed by additional NEPA evaluation. The decision in

*Marsh* further drives home this point. *See* 490 U.S. at 374 (noting that NEPA's "rule of reason"

8

requires consideration of the "value of the new information" to the agency's decision making process).

Defendants do not dispute that the federal coal management program continues today. In section I.E., below, we demonstrate the environmental significance of the continuing action. A supplemental PEIS at this point in the Program would inform subsequent leasing decisions by taking into account the contributions of the leasing decisions, in total, to the effects of global warming. Thus, a supplemental PEIS would provide BLM with an opportunity to evaluate the new information and determine whether a change to its Program is necessary in light of such information.

B.     The Cases Cited by Defendants Demonstrate that Defendants Have a Discrete Mandatory Duty to Supplement the 1979 PEIS.

The cases cited by Defendants fail to support Defendants' argument that BLM has no duty to supplement the 1979 PEIS. Indeed, the cases relied on by Defendants and discussed below *require* a NEPA statement prepared for an ongoing major federal action to be supplemented where necessary. Defendants rely on *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) ("*SUWA*"), for their argument that the issuance of the regulations establishing the coal leasing Program marked the completion of the proposed "major Federal action" subject to NEPA. Motion at 9-10.

But *SUWA* does not address the question of when a PEIS prepared for an ongoing national program requires supplementation. The Court in *SUWA* held that the agency had no obligation to supplement an EIS prepared for a *concluded* federal action. In reviewing the approval of a land use plan pursuant to the Federal Land Policy and Management Act, the Court found determinative a regulation explicitly defining the approval of the land use plan as the discrete action that concluded the agency's NEPA duties.  *See* 542 U.S. at 73 (quoting 43 C.F.R.

9

§ 1601.0-6 (2003), providing that "the '*[a]pproval* of a [land use plan]' is a 'major Federal action' requiring an EIS" (emphasis in *SUWA*)).

In the present case, there is no regulation defining what agency actions constitute major federal actions. For that, we must turn to the specific facts of this case, which, as shown in sections I.C. and I.D., below, support Plaintiffs' contention that the ongoing Program is a continuing major federal action. For example, BLM's statements in the 1979 PEIS about its scope show the ongoing implementing nature of the Program. BLM wrote, "The statement is programmatic in scope and discusses the national and interregional impacts associated with the Federal Coal Management Program." Letter from Frank Gregg, BLM Director, accompanying 1979 PEIS. It goes on to list "unavoidable national and inter-regional impacts of coal production that could be affected by decisions made under the program." *Id.*

Nothing in the Court's decision in *SUWA* indicates that the Court intended its analysis to apply beyond the unique land use plan and regulatory landscape in that case, let alone to an agency's establishment of a national long-term program, such as the federal coal management program. In fact, *SUWA* itself offers a characterization of an agency land use plan that easily distinguishes such a plan from the establishment of the Program implementing a statutory mandate to lease coal: "[A] land use plan is generally a statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them." *SUWA*, 542 U.S. at 71. By contrast, BLM's creation of an ongoing Program to manage and lease coal is an implementing action directed by Congress, an action that is certainly something far more than a "statement of priorities." Defendants' efforts to expand *SUWA*'s holding beyond the circumstances in that case to apply to the facts at hand would place more weight on the decision than its narrow holding could bear. Likewise, *SUWA* did not limit the scope of the holding in

*Marsh*, which established that an agency has a duty to supplement so long as significant federal action remains to occur. *See* 490 U.S. at 371-72 ("Often an initial EIS is sufficient, but in certain circumstances an EIS must be supplemented," citing *Marsh*).

Accordingly, it is the continued implementation of the federal coal management program and not the lack of a new regulatory proposal that is determinative of Defendants' NEPA obligations. Defendants mistakenly assert that *Kleppe v. Sierra Club*, 427 U.S. 390 (1976), supports their argument that no new NEPA obligations apply with regard to the Program unless BLM makes a new regulatory proposal. Motion at 11. To the contrary, the Court in *Kleppe* was concerned with ensuring that NEPA not be construed to require *redundant* levels of NEPA analysis—for example, a regional EIS where no regional plan existed and where the national program and each constituent project would receive an EIS. 427 U.S. at 401. Without a "regional plan [that] would define precisely the scope and limits of the proposed development of the region," "[t]here would be no factual predicate for the production" of a regional EIS. *Id.* at 402. Thus, because the agency had not advanced a plan for federal coal leasing in the Northern Great Plains region, the *Kleppe* Court held that NEPA did not require a regional EIS addressing impacts from coal leasing in that region. *Id.* at 414-15.

*Kleppe* therefore does not support Defendants' argument that no duty to supplement has been triggered. The Court in *Kleppe* determined that, as to the number of levels of NEPA analysis required, two levels of EISs were all that NEPA required in this instance because the agency had advanced plans for those two levels; only at the national programmatic level and at the lease-specific level could a "major Federal action" be found. Where, however, BLM has established a national coal management program, the Court noted that a programmatic EIS was required by NEPA. *Id.* at 400 (recognizing that NEPA "required the Coal Programmatic EIS that

was prepared in tandem with the new national coal-leasing program [because] the new leasing program is a coherent plan of national scope" and carries "significant environmental consequences").

Nowhere does *Kleppe* speak to whether the issuance of a regulation is the conclusion of major federal action, nor to the question of when an agency has a duty to supplement an already issued EIS. Those issues were instead directly dealt with by cases cited above—*Appalachian Regional Commission*, *Friends of the Clearwater*, and *Marsh*—each of which was decided after *Kleppe*.[2]

*Marsh*, *Friends of the Clearwater*, and *Appalachian Regional Commission* establish that Defendants' efforts to expand the holdings in *Kleppe* and *SUWA* to require dismissal of this action stretch those cases past their breaking point. Defendants' contention that NEPA does not impose a discrete, mandatory duty to supplement the 1979 PEIS cannot be squared with the law. *See Marsh*, 490 U.S. at 374 ("If there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared"); *id.* at 385 ("There is little doubt that if all of the [proffered information] was both new and accurate, the Corps would have been required to prepare a second supplemental EIS."); *SUWA*, 542 U.S. at 73 ("supplementation is necessary . . . if there remains 'major Federal action' to occur"); *Friends of the Clearwater*, 222 F.3d at 557 (agency "must . . . prepare a supplemental EIS when there are 'significant new circumstances or

---

[2] Courts have relied on both *Appalachian Regional Commission* and *Friends of the Clearwater* since the decision in *SUWA*. It cannot be said, therefore, that *SUWA* overruled or limited the analyses in either of those cases. *See, e.g., Piedmont Envt'l Council*, 558 F.3d at 316 (applying *Appalachian Regional Commission*); *Great Old Broads for Wilderness*, 709 F.3d 836, 855 (9th Cir. 2013) (applying *Friends of the Clearwater*); *Kunaknana v. U.S. Army Corps of Engineers*, 23 F. Supp. 3d 1063, 1090 (D. Alaska 2014) (applying *Friends of the Clearwater*).

information'''); *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1024 (9th Cir. 1980)

("When new information comes to light the agency must consider it, evaluate it, and make a

reasoned determination whether it is of such significance as to require [an SEIS]."). There can be

little doubt that where sufficient federal action remains to occur, the duty to supplement in light

of new and significant information is a discrete and mandatory one.

 The federal coal management program is an ongoing major federal action, as addressed in

more detail in I.C., below. Thus, Defendants' reliance on *Lujan v. National Wildlife Federation*,

497 U.S. 871 (1990), for their argument that NEPA does not impose a duty to supplement under

these circumstances is misplaced. *Lujan* addresses only the question of when a series of similar

actions taken by the agency constitutes final agency action, such that the *program itself* can be

directly challenged under the APA. The Court confronted the question of whether a program

existed at all, and determined that it did not.

 *Lujan* is inapposite to this case for two reasons. First, the Court's holding, that the actions

that plaintiffs asserted constituted a "program" did not constitute final agency action, has no

application to this case. It is beyond reasonable dispute that the series of coal leasing decisions

taken by BLM were conducted as part of the agency's Program. *See, e.g., Kleppe*, 427 U.S. at

400 ("the federal petitioners agreed . . . that [NEPA] required the Coal Programmatic EIS that

was prepared . . . as part of the final report on the proposal for adoption of that program").

 Second, unlike as in *Lujan*, the agency action challenged by Plaintiffs is the failure to

supplement an already prepared EIS for a series of actions that have been characterized by the

agency itself as a program. In *Lujan*, plaintiffs argued that the agency program itself was

unlawful. Here, Plaintiffs do not challenge the federal coal management program itself. Nowhere

in *Lujan* does the Court address whether the failure to supplement a final EIS is agency action cognizable under the APA. That question was answered later by *Marsh*, 490 U.S. at 375-76.

Given that the Court in *Lujan* was concerned with whether an agency program was subject to direct challenge under the APA, the Court's admonition that Congress and not the courts was the proper venue for obtaining such relief is eminently reasonable. *See* 497 U.S. at 891. Defendants place great weight on the Court's holding that the agency program at issue could only be challenged on a lease-by-lease basis, rather than at the programmatic level. Motion at 8-9. This reasoning has no application to the issues presented to the Court here. Plaintiffs do not ask this Court to improve the federal coal management program itself, only that BLM be compelled to comply with NEPA's procedural requirements. Compl. ¶¶ 187-97.

      C.    <u>The Federal Coal Management Program is a Continuing Federal Action Subject to NEPA's Obligations.</u>

      i.    *Plaintiffs Have Alleged Sufficient Facts to Establish that the Federal Coal Management Program is a Continuing Major Federal Action Standing On Its Own.*

Plaintiffs have adequately alleged that the federal coal management Program is conducted according to a set of regulations and policies to permit the Court to find that the Program is a continuing federal action. Compl. ¶¶ 47-51. For example, as of 2013, as part of the Program, BLM manages 309 existing leases in 10 states across the United States and continually processes applications for new leases and modifications to existing leases. *Id.* ¶ 4. New leases continue to be issued under the Program each year. *Id.* ¶ 18. In fiscal year 2013 alone, BLM issued four new competitive non-regional lease-by-application coal leases, in addition to other types of new leases. *Id.* ¶ 18. BLM also granted numerous applications for lease modifications to add acreage to existing leases, and issued three coal exploration licenses in fiscal year 2013. *Id.* ¶ 18. BLM issues these leases as part of its federal coal management program. *See* U.S. BLM,

Final Environmental Impact Statement for the Wright Area Coal Lease Applications (July 2010) at 1-18 ("The development of federal coal reserves is integral to the *BLM coal leasing program* under the authority of the Mineral Leasing Act of 1920 (MLA), as well as the Federal Land Policy Management Act of 1976 (FLPMA) and the Federal Coal Leasing Act Amendments of 1976 (FCLAA)" (emphasis supplied); U.S. BLM, Final Land Use Analysis and Final Environmental Impact Statement for the East Lynn Lake Coal Lease 264, EIS-ES-030-2008-0004 (Mar. 2009) at ii ("The BLM coal leasing *program* encourages private development of federal coal reserves …") (emphasis supplied)).

The allegations in the Complaint demonstrate that both Defendants and the courts have consistently treated the Program as a continuing federal action requiring NEPA analysis. *See Kleppe*, 427 U.S. at 400. Defendants' attempt to draw their own inferences from the facts alleged in the Complaint cannot be the basis of dismissal for failure to state a claim for relief. *Sparrow*, 216 F.3d at 1113 (in reviewing a motion to dismiss under Rule 12(b)(6), the court "must treat the complaint's factual allegations as true" and "must grant plaintiff the benefit of all inferences that can be derived from the facts alleged" (internal quotation marks omitted)).

    ii.  *The 1979 PEIS Analyzes the Environmental Impacts of Activities to be Conducted Under the Federal Coal Management Program, Rather Than Simply a Procedural Rulemaking.*

Defendants contend that the 1979 PEIS was conducted "solely for the issuance" of a BLM rulemaking promulgating regulations regarding the Program. Motion at 2-3. With this argument, they apparently imply that the BLM's NEPA analysis has nothing to do with the actual implementation of a program of leasing and mining billions of tons of coal from federal lands. If that view were accepted, the NEPA process would become a meaningless paper exercise, entirely divorced from the choices an agency makes when implementing its programs.

Moreover, the text of the 1979 PEIS itself belies Defendants' argument. BLM stated in the 1979 PEIS that the document was intended to address environmental impacts far beyond the scope of merely the rulemaking: "National and interregional impacts of the Federal coal management program are analyzed in this programmatic environmental impact statement. The document would be updated when conditions change sufficiently to require new analyses of those impacts." 1979 PEIS at 3-9 (emphasis supplied). If the 1979 PEIS were conducted solely to analyze effects of the rulemaking, as Defendants contend, the agency's commitment to update the document as "conditions change" would be nonsensical.[3] Surely, if the agency were simply analyzing the issuance of a regulatory framework, BLM would have used a phrase more reflective of that position.

BLM's description of the purpose of the 1979 PEIS supports this conclusion. In BLM's own words, the purpose of the 1979 PEIS is to "assess[] the national impacts of a Federal coal management program and *related Federal coal policies*," 1979 PEIS at 1-3 (emphasis supplied), and to "address[] the total national demand for coal, and impacts associated with Federal and non-Federal coal development," 1979 PEIS at 1-4. These statements indicate the document was conducted to analyze the effects of activities conducted under the federal coal management program, not merely the agency rulemaking.

Plaintiffs' argument that federal action analyzed in the 1979 PEIS is the federal coal management program, not merely the regulation, is further supported by BLM's commitment to maintain multiple levels of NEPA analysis, with the 1979 PEIS serving as the top-level analysis,

---

[3] Indeed, the title of the 1979 PEIS itself, *Final Environmental Statement: Federal Coal Management Program*, indicates the document's scope included the activities conducted under the program, not merely the promulgation of regulations. *See also* Letter from Frank Gregg, BLM Director, accompanying 1979 PEIS ("The statement is programmatic in scope and discusses the national and interregional impacts associated with the Federal Coal Management Program.").

to satisfy its NEPA obligations with respect to the Program. The 1979 PEIS states: "Current

Departmental policy for preparing environmental assessments and impact statements . . . covers

generic (programmatic), regional, and site-specific considerations." 1979 PEIS at 1-5. There can

be no question that BLM recognized its obligation under NEPA to maintain multiple levels of

environmental review during the course of the Program, as evidenced in a portion of the 1979

PEIS titled, significantly, "Post-Programmatic Environmental Analysis":

> The Department, in formulating the preferred coal management program, considered
> which key leasing decision points could represent major Federal actions within the
> meaning of [NEPA].
>
> The preferred option is to maintain two separate levels of environmental impacts
> analysis, one to consider interregional and national impacts and one to consider site-
> specific and cumulative intraregional impacts. The first level of analysis would be
> contained in this programmatic environmental impact statement, *updated when
> necessary*, and the second level of analysis would be made in environmental impact
> statements for each region covering the four-year sales periods and discussing the tract
> delineation, ranking, and selection process.

1979 PEIS 3-68 (emphasis supplied). This framework demonstrates BLM's commitment to

update the 1979 PEIS as necessary to comply with NEPA as leasing continued under the

Program.

> D.   Plaintiffs Have Adequately Alleged that Sufficient Government Action
>      Remains to Require Supplementation of the 1979 PEIS.

The federal coal management program has not proceeded past the point where NEPA

analysis could no longer inform agency decisionmaking. *Marsh*, 490 U.S. at 371-72 (noting that

NEPA obligations continue to apply so long as "the remaining governmental action would be

environmentally 'significant'" (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 188 n.34

(1978))). The Complaint alleges that no end is in sight for federal leasing of the right to mine

coal, Compl. ¶¶ 50-51, 194; that substantial amounts of federal coal remain to be developed, *id*.

¶¶ 50-51; and that mining and combusting this coal will result in significant environmental

impacts, *id*. ¶¶ 102-81. Defendants do not dispute these facts, nor are they entitled to do so at this stage in the proceeding. *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003).

Dismissing Plaintiffs' claims at this early stage would be contrary to law, *supra*, and would cut off agency consideration of an important and significant environmental impact of the federal coal management program, contrary to NEPA's objective to ensure that agencies are informed of all environmental impacts of an action before completing that action. *See Marsh*, 490 U.S. at 371-74. The major federal action analyzed by the 1979 PEIS was the leasing, and therefore mining, of federal coal, an action that continues to this day. Compl. ¶¶ 52-79. BLM itself recognized in the 1979 PEIS that the coal it planned to lease would be almost exclusively burned for electricity generation and that the emissions from combustion of the coal could contribute to the warming of the atmosphere. Compl. ¶ 64. BLM acknowledged then that the effects of global warming were not well understood, and that growing knowledge about such effects might require BLM to update its analysis of the environmental impacts coal leasing if "conditions" such as these changed during the life of the Program. *Id.* ¶ 64.

Thus, the facts alleged in the Complaint are sufficient to establish a claim under the APA § 706(1) and § 706(2) that (1) Defendants have a discrete, mandatory, duty under NEPA to supplement the 1979 PEIS, and (2) Defendants have failed, in violation of NEPA, to discharge that duty.

> E.    <u>Plaintiffs Have Adequately Alleged that the Increased Understanding of Global Warming and the Effects on Global Warming of the Federal Coal Management Program is New and Significant Information.</u>

Plaintiffs have alleged sufficient facts to permit the Court to make the factual determination that increased understanding of global warming and the related effects of the

federal coal management program constitute new and significant information.[4] For purposes of review of a motion under Rule 12(b)(6), the Complaint's allegations are sufficient to establish that the information proffered by Plaintiffs is both new and significant as those terms are used in 40 C.F.R. § 1502.9(c). *See Sparrow*, 216 F.3d at 1113. The Complaint includes exhaustive and detailed allegations detailing new (since 1979) and significant scientific findings and understanding of global warming and its causes and effects, and of conventional pollutants emitted during coal combustion. Compl. ¶¶ 95-181. The substantial increase in coal development under the federal coal management program is also new and significant information. *Id*. ¶¶ 5, 100.

For example, in the period since the 1979 PEIS, two conditions changed radically: the quantities of coal mined from federal lands and the understanding of the threat of climate disruption have both significantly increased. Between 1979 and 2013, sales of coal mined on federal lands has climbed from almost nothing to 42.1% of all U.S. coal sold in 2012. *Id*. ¶¶ 5, 100. Coal mined on federal lands now accounts for approximately 724 million metric tons of $CO_2$ emissions, or approximately 11% of our nation's emissions of carbon dioxide, the greenhouse gas primarily responsible for climate change. *Id*. ¶ 101. Over 2 billion short tons of coal have been leased just since the beginning of the Obama Administration. *Id.* ¶ 51.

It is now known that,

> [T]he scientific evidence is sound, that the pace of the change and onset of impacts is intensifying and becoming more detrimental more rapidly than previously projected, and that continued mining and combustion of coal…at the rate occurring in the U.S. must be rapidly and sharply cut if the increase in global average temperature is to be limited to the international goal of no more than ~2°C (3.6°F) over preindustrial conditions and other increasing impacts and risks of climate change are to be moderated."

---

[4] Whether proffered evidence is new and significant under 40 C.F.R. § 1502.9(c) is a question of fact. *Marsh*, 490 U.S. at 361.

MacCracken Decl., Dkt 1-1 at 3.

In response to this information, the nations of the world have agreed upon a goal of preventing increases in average atmospheric temperature of more than 2°C (3.6°F). MacCracken Decl., Dkt 1-1 at 31. In order to restrain average temperatures to that target, the total remaining "budget" of $CO_2$ emissions for the entire world may not exceed 1,000 billion tons. MacCracken Decl., Dkt 1-1 at 33. Extracting and burning all U.S. coal reserves would use up approximately three-fourths of this entire global carbon "budget." *Id.*

The significant new information about the environmental impact of greenhouse gas emissions led the EPA to conclude formally in 2009 that global warming substantially endangers human health and the environment. Compl. ¶¶ 109-13. Other international organizations in which the United States participates, and national scientific assessment organizations, have reached similar conclusions. *Id.* ¶¶ 114-15, 116-52. Economists have concluded that global warming will have a significant negative effect on the U.S. economy, *Id.* ¶¶ 153, 161-63, 166. The Department of Defense and other national security agencies of the U.S. government have identified global warming as threatening extremely serious consequences, including destabilization of national governments, rising terrorism, and new geopolitical conflicts that will stress U.S. military resources. *Id.* ¶¶ 171-81.

These allegations, taken as true, are sufficient to establish that the information proffered is new and significant, pursuant to 40 C.F.R. § 1502.9(c)(ii).

II.    **Defendants' Failure to Supplement the 1979 PEIS is Final Agency Action Reviewable Under the Administrative Procedure Act.**

Plaintiffs assert a cognizable claim under the Administrative Procedure Act, 5 U.S.C. § 706(1). That subsection provides a cause of action seeking to "compel agency action unlawfully

withheld or unreasonably delayed." The APA defines "agency action to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or *failure to act*." 5 U.S.C. § 551(13) (emphasis supplied). This definition is "expansive." In *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt*, the Court noted that "agency action" as defined by § 551(13) is "meant to cover comprehensively every manner in which an agency may exercise its power." 460 F.3d 13, 19-20 (internal citations omitted).

The failure to perform a discrete regulatory obligation under NEPA is cognizable under § 706(1). *See SUWA*, 542 U.S. at 64 (holding that "a claim under § 706(1) can proceed . . . where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*" (emphasis in original)); *Friends of the Clearwater*, 222 F.3d at 560 (holding an action to compel an agency to prepare a supplemental EIS arises under 5 U.S.C. § 706(1)).  As demonstrated in Section I, *supra*, Defendants have a discrete mandatory duty to consider significant new information bearing on the environmental impacts of the federal coal management program. Having failed to execute that duty, Defendants' inaction is subject to judicial review under § 706(1).[5]

## CONCLUSION

Thirty-eight years ago, the President of the United States ordered that:

> The Federal Government shall provide leadership in protecting and enhancing the quality of the Nation's environment to sustain and enrich human life. Federal agencies shall initiate measures needed to direct their policies, plans and programs so as to meet national environmental goals.

---

[5] There is little doubt that a claim to compel an agency to take a discrete, mandatory action is proper under § 706(1). *See SUWA*, 542 U.S. at 64. But under the plain text of the APA, such a claim is also cognizable under § 706(2). *See N.A.A.C.P.*, 817 F.2d at 160. That section provides that a court shall set aside "agency action" found to be unlawful. As noted *supra*, "agency action" is defined to include "failure to act." 5 U.S.C. §§ 701(b)(2), 551(13). Thus, Plaintiffs' claim is properly brought under either subsection (1) or (2).

Exec. Order No. 11514, 35 Fed. Reg. 4,247 (Mar. 7, 1970). Rather than "initiate measures . . . to direct [its] . . . program[] so as to meet national environmental goals," the BLM asks this Court to endorse the agency's refusal to examine the new and significant environmental impacts of the federal coal management program. Plaintiffs ask only that, in accord with NEPA and the APA, this Court reject the BLM's attempt to avoid analysis and discussion of the impact of the federal coal management program, taking into account the new and significant information about the environmental impact of carbon dioxide emissions from burning coal mined on federal lands.

For the foregoing reasons, Plaintiffs respectfully request the Court to deny Defendants' Corrected Motion to Dismiss.

Respectfully submitted this 13th day of February, 2015,

/s/ Richard E. Ayres
RICHARD E. AYRES (DC Bar No. 212621)
JESSICA L. OLSON (DC Bar No. 497560)
JOHN H. BERNETICH (DC Bar No. 1018769)
Ayres Law Group LLP
1707 L Street NW, Suite 850
Washington, DC 20036
T: (202) 452-9200 / F: (202) 872-7739
ayresr@ayreslawgroup.com
olsonj@ayreslawgroup.com
bernetichj@ayreslawgroup.com
*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing is being filed with the Clerk of the Court using the

CM/ECF system, thereby serving it on all parties of record, this 13th day of February, 2015.


*/s/ Jessica L. Olson*
Jessica L. Olson
Counsel for Plaintiffs