Michael J. McGrady (Wyo. State Bar No. 6-4099)
Jeremiah I. Williamson (Wyo. State Bar No. 7-4748)
Wyoming Attorney General's Office
123 State Capitol
Cheyenne, Wyoming 82002
(307) 777-6946
(307) 777-3542 *facsimile*
mike.mcgrady@wyo.gov
jeremiah.williamson@wyo.gov
*Attorneys for Proposed Intervenor- Defendant State of Wyoming*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WESTERN ORGANIZATION OF RESOURCE COUNCILS and FRIENDS OF THE EARTH, | ) ) ) ) | |
| *Plaintiffs*, | ) ) | Case No. 1:14-cv-01993-RBW |
| v. | ) ) | |
| SALLY JEWELL, in her capacity as Secretary of the Interior, DEPARTMENT OF THE INTERIOR, NEIL KORNZE, in his capacity as Director, Bureau of Land Management, BUREAU OF LAND MANAGEMENT, | ) ) ) ) ) ) ) | |
| *Defendants.* | ) | |

## STATE OF WYOMING'S MOTION TO DISMISS

The State of Wyoming moves the Court to dismiss the Plaintiffs' complaint

for failing to state a claim upon which relief may be granted under Federal Rule of

Civil Procedure 12(b)(6). In support of this motion, Wyoming has filed a

memorandum of law and a proposed order. For the reasons explained in the memorandum, Wyoming urges the Court to grant its motion and dismiss the complaint with prejudice.

Submitted this 30th day of January 2015.

/s/ Jeremiah I. Williamson
Michael J. McGrady (Wyo. State Bar No. 6-4099)
Jeremiah I. Williamson (Wyo. State Bar No. 7-4748)
Wyoming Attorney General's Office
123 State Capitol
Cheyenne, Wyoming 82002
(307) 777-6946
(307) 777-3542 *facsimile*
mike.mcgrady@wyo.gov
jeremiah.williamson@wyo.gov
*Attorneys for Proposed Intervenor-Defendant*
*State of Wyoming*

Michael J. McGrady (Wyo. State Bar No. 6-4099)
Jeremiah I. Williamson (Wyo. State Bar No. 7-4748)
Wyoming Attorney General's Office
123 State Capitol
Cheyenne, Wyoming 82002
(307) 777-6946
(307) 777-3542 *facsimile*
mike.mcgrady@wyo.gov
jeremiah.williamson@wyo.gov
*Attorneys for Intervenor- Defendant State of Wyoming*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WESTERN ORGANIZATION OF ) RESOURCE COUNCILS and ) FRIENDS OF THE EARTH, ) ) *Plaintiffs*, ) ) v. ) ) SALLY JEWELL, in her capacity as ) Secretary of the Interior, ) DEPARTMENT OF THE INTERIOR, ) NEIL KORNZE, in his capacity as ) Director, Bureau of Land Management, ) BUREAU OF LAND MANAGEMENT, ) ) *Defendants*, ) ) STATE OF WYOMING, ) ) *Intervenor-Defendant*. ) | Case No. 1:14-cv-01993-RBW |

## STATE OF WYOMING'S MEMORANDUM IN SUPPORT
## OF MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iii

INTRODUCTION ............................................................................................1

BACKGROUND ..............................................................................................1

I.      The Department of the Interior creates a top-down, government-driven
        national coal management program in 1979 ......................................................1

        A.      Speculation, legislation, and an energy crisis spur change ........................2

        B.      Two leasing models: a national coal management program and
                an *ad hoc* leasing process ..........................................................................4

        C.      The national program runs into hurdles out of the gate ............................8

II.     The Interior Department abandons the national program not long after
        implementation ..............................................................................................11

III.    The conservation organizations claim the BLM must update the
        programmatic NEPA analysis for the national program .................................15

ARGUMENT .................................................................................................17

I.      The BLM has no obligation to update the 1979 programmatic statement
        until it takes action under the program that statement analyzed .....................18

        A.      The 1979 programmatic statement analyzed the regional
                leasing program as the proposed major federal action ............................19

        B.      The BLM has not taken any action under the regional leasing
                program ....................................................................................................20

        C.      Because the BLM has not taken action under the national coal
                management program, the agency has no obligation to update
                the 1979 environmental analysis of the program ....................................23

II.   Because BLM has no present obligation to update the 1979 programmatic statement, the conservation organizations have failed to state a claim upon which relief may be granted ............................................................................25

CONCLUSION ...................................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Ariz. Mining Ass'n v. Jackson*,
    708 F. Supp. 2d 33 (D.D.C. 2010)...............................................................17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................17, 25

*Baker v. Henderson*,
    150 F. Supp. 2d 13 (D.D.C. 2001)..................................................................2

*Bates v. Donley*,
    935 F. Supp. 2d 14 (D.D.C. 2013)..................................................................2

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................17, 25

*Fla. Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs*
    374 F. Supp. 2d 1116 (S.D. Fla. 2005).........................................................19

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976)...............................................................18, 19, 23, 24

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990)...............................................................22, 23, 26

*Marsh v. Or. Natural Res. Council*,
    490 U.S. 360 (1989)....................................................................23

*Nat'l Wildlife Fed'n v. Appalachian Reg'l Comm'n*,
    677 F.2d 883 (D.C. Cir. 1981)..............................................................18, 23

*Natural Res. Def. Council v. Hughes*,
    437 F. Supp. 981 (D.D.C. 1977)....................................................................3

*Northcoast Envtl. Ctr. v. Glickman*,
    136 F.3d 660 (9th Cir. 1998).........................................................................25

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)........................................................................18

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    --- F. Supp. 2d ---, 13-cv-1239-KBJ, 2014 WL 4066256
    (D.D.C. Aug. 18, 2014) ...................................................................26

*WildEarth Guardians v. BLM*,
    8 F. Supp. 3d 17 (D.D.C. 2014)........................................................26

*WildEarth Guardians v. Jewell*,
    738 F.3d 298 (D.C. Cir. 2013)..........................................15, 26, 27

*WildEarth Guardians v. Salazar*,
    783 F. Supp. 2d 61 (D.D.C. 2011)...............................................12, 26

*Young v. Gen. Servs. Admin.*,
    99 F. Supp. 2d 59 (D.D.C. 2000)......................................................24

**Statutes**

30 U.S.C. § 181 ...................................................................1, 2, 3, 21

30 U.S.C. § 189 ...............................................................................2

30 U.S.C. § 1201 ......................................................................4, 21

30 U.S.C. § 1253 .........................................................................22

42 U.S.C. § 4332(C)................................................................1, 18, 23

43 U.S.C. § 1701 ........................................................................3, 21

43 U.S.C. § 1752(a) ....................................................................22

Pub. L. No. 94-377, 90 Stat. 1083 (1976)...............................3, 21

Pub. L. No. 94-579, 90 Stat. 2743 (1976).....................................3

Pub. L. No. 95-87, 91 Stat. 445 (1977).........................................4

iv

Pub. L. No. 98-63, 97 Stat. 328 (1983) ....................................................9

Pub. L. No. 98-146,  97 Stat. 919 (1983) ................................................9

**Code of Federal Regulations**

40 C.F.R. § 1502.9(c)(1)(ii) .............................................................19, 23

43 C.F.R. § 3420.0-3 .........................................................................22

43 C.F.R. § 3420.2(c)(7) ......................................................................4

43 C.F.R. § 3420.3-4(g) ....................................................................5, 6

43 C.F.R. § 3425.0-2.........................................................................5, 6

**Administrative Materials**

Adjustments to Coal Management Program Regulations,
    47 Fed. Reg. 33,114 (July 30, 1982) ................................................8

Cancellation; Fort Union Federal Coal Production Region,
    53 Fed. Reg. 13,195 (April 21, 1988)...............................................12

Coal Management; Federally Owned Coal,
    44 Fed. Reg. 42,615 (July 19, 1979) ................................................4

Coal Management—General,
    51 Fed. Reg. 18,884 (May 23, 1986)...............................................10

Coal Management Program; San Juan River Federal Coal Production
    Region, 53 Fed. Reg. 44,956 (Nov. 7, 1988)...............................11, 12

Decertification of the Powder River Coal Production Region,
    55 Fed. Reg. 784 (Jan. 9, 1990)......................................................12

Powder River Federal Coal Production Region, WY; Coal Lease
    Application, 61 Fed. Reg. 64,919 (Dec. 9, 1996)..............................21

Public Participation in Coal Leasing,
64 Fed. Reg. 52,239 (Sept. 28, 1999)................................................12, 13, 20

Southern Appalachian Federal Coal Production Region—Alabama
Subregion, 52 Fed. Reg. 608 (Jan. 7, 1987) ...........................................10, 12

Uinta-Southwestern Utah Regional Coal Leasing Environmental Impact
Statement, 45 Fed. Reg. 68,468 (Oct. 15, 1980) ...........................................8

U.S. Dept. of the Interior, Federal Coal Management Program:
Final Environmental Statement (April 1979) ........................................*passim*

U.S. Dept. of the Interior, Federal Coal Management Program: Final
Environmental Impact Statement Supplement (Oct. 1985).............2, 8, 10, 13

U.S. Dep't of the Interior, Bureau of Land Mgmt., Final Environmental
Impact Statement for the South Gillette Area Coal Lease
Applications (Aug. 2009) .......................................................................14, 20

U.S. Dep't of the Interior, Bureau of Land Mgmt., Final Environmental
Impact Statement for the West Antelope II Coal Lease
Application (Dec. 2008) .................................................................................15

Utah, Colorado: Uinta-Southwestern Utah Federal Coal Production
Region, 52 Fed. Reg. 48,327 (Dec. 21, 1987)..............................................12

Wyoming and Montana; Powder River Regional Coal Team Meeting,
46 Fed. Reg. 44,517 (Sept. 4, 1981)...............................................................8

**Other Authorities**

Report of the Commission on Fair Market Value Policy for Federal
Coal Leasing (Feb. 1984) ...............................................................................9

## INTRODUCTION

The Western Organization of Resource Councils and Friends of the Earth (conservation organizations) ask this Court to order the Department of the Interior and the Bureau of Land Management (BLM) to perform a nationwide, programmatic analysis of the climate change impacts of a coal management program that has not been used since the advent of the world wide web. Contrary to the conservation organizations suppositions, the federal agency defendants' obligation under the National Environmental Policy Act (NEPA) to evaluate environmental impacts arises only when they undertake a "major federal action." 42 U.S.C. § 4332(C). Because neither the Interior Department nor the BLM has taken any action, let alone a major one, in the national coal management program since 1999, neither agency is under any obligation now to evaluate the climate change impacts of the idle program. As a result, the conservation organizations have failed to state a claim upon which relief may be granted. This Court should, therefore, dismiss their complaint.

## BACKGROUND

### I.    The Interior Department creates a top-down, government-driven national coal management program in 1979.

In the Mineral Leasing Act of 1920, Congress provided that "[d]eposits of coal … and lands containing such deposits owned by the United States … shall be subject to disposition in the form and manner provided in this chapter." 30 U.S.C.

§ 181. Congress, in turn, authorized the Secretary of the Interior "to prescribe necessary and proper rules and regulations to do any and all things necessary to carry out and accomplish the purposes of this chapter." *Id*. § 189. Acting under this broad authority, the Secretary leased substantial federal coal reserves from 1920 until 1970 without any formal leasing procedures. *See* U.S. Dept. of the Interior, Federal Coal Management Program: Final Environmental Statement 2-5 (April 1979) (1979 PEIS), *available at* https://archive.org/stream/federalcoalmanag07unit#page/n3/mode/2up.[1]

### A. Speculation, legislation, and an energy crisis spur change.

In 1970, the BLM, which oversees the Interior Department's coal leasing, discovered evidence of leasing irregularities. Although coal leases in western states increased ten-fold from 1945 to 1970, coal production in the same region fell by thirty percent over the same time period. *Id*. at 1-9. Thus, "[o]f the total acreage under lease, over 90 percent was not producing coal." *Id*. The Bureau concluded this showed that leases were held for speculative purposes and, in response,

---

[1] When ruling upon a motion to dismiss, "the court may consider … any documents either attached to or incorporated in the complaint," *Baker v. Henderson*, 150 F. Supp. 2d 13, 15 (D.D.C. 2001) (citation omitted), and "public documents without converting the motion [to dismiss] into a motion for summary judgment," *Bates v. Donley*, 935 F. Supp. 2d 14, 17 (D.D.C. 2013) (citation omitted). The conservation organizations' complaint incorporates the 1979 EIS, as well as the 1985 SEIS discussed infra, both of which are public documents this Court may consider. *See* Compl. 6-7, ¶¶ 13-16.

suspended coal leasing. *Id*.; *see also Natural Res. Def. Council v. Hughes*, 437 F. Supp. 981, 985 (D.D.C. 1977) (noting problem of speculation).

While the Interior Department and the BLM evaluated how better to manage the nation's coal reserves, two influential events occurred. First, the United States experienced an energy crisis. 1979 PEIS 1-8 (describing "the Nation's serious energy problem"). In response, President Jimmy Carter crafted a National Energy Plan, which focused on dramatically increasing production of coal from federal reserves. *Id*. (explaining goal of "doubling 1977 annual production by 1985"); *see also id*. at 1-37 (noting objective to "[i]ncrease annual coal production by at least 400 million tons over 1976 levels"). The National Energy Plan played a prominent role in what would become the national coal management program.

Second, Congress enacted three statutes impacting mining of federal coal reserves. In August 1976, Congress enacted the Federal Coal Leasing Act Amendments, which authorized the Secretary to delineate coal leasing tracts, ensure economic recovery of coal reserves, and offer coal tracts for lease. *See* Pub. L. No. 94-377, 90 Stat. 1083 (1976) (codified at 30 U.S.C. §§ 181 to 196). Two months later, Congress passed the Federal Land Policy and Management Act, which dramatically overhauled management of the majority of the public lands containing coal reserves. *See* Pub. L. No. 94-579, 90 Stat. 2743 (1976) (codified at 43 U.S.C. §§ 1701 to 1787) (imposing comprehensive land management planning

requirements). And, finally, in 1977, Congress enacted the Surface Mining Control and Reclamation Act, which created a cooperative federalism system for regulating and reclaiming surface mine operations. *See* Pub. L. No. 95-87, 91 Stat. 445 (1977) (codified at 30 U.S.C. §§ 1201 to 1328).

These three facts—historical problems in federal coal leasing, President Carter's policy push for increased coal production, and the new legislation impacting coal—drove the Interior Department to undertake a comprehensive rule-making effort. That effort culminated in July 1979 when the Interior Department adopted new coal-leasing regulations. *See* Coal Management; Federally Owned Coal, 44 Fed. Reg. 42,615 (July 19, 1979).

**B.    Two leasing models: a national coal management program and an *ad hoc* leasing process.**

The 1979 regulations set forth two distinct methods for coal leasing. The predominant leasing model, known as the national coal management program, emphasized government-driven leasing of coal reserves within designated coal production regions certified by the Secretary. *See generally* 43 C.F.R. Subpart 3420. Under this program, the then newly created United States Department of Energy would biennially update five-, ten-, and fifteen-year national coal production levels based on anticipated supply and demand. 1979 PEIS 3-3, 3-57 to 58. The Interior Department, in turn, would use those "national energy projections to establish how much coal is to be leased." *Id*. at 1-3; 43 C.F.R. § 3420.2(c)(7).

4

The program provided for implementation of those national production levels within the coal production regions, each of which would be assigned four-year lease sale schedules to meet regional sales and production targets. 43 C.F.R. § 3420.3-4(g); 1979 PEIS 3-6. To meet those schedules and fulfill those targets, regional coal teams would delineate, rank, and offer for sale those tracts that the regional teams believed would best serve program objectives, including production targets. 1979 PEIS 3-2 (explaining that the United States would "decide which areas of Federal coal reserves would be considered for coal production, and … delineate, rank, and select for sale specific tracts of coal"). The activities within each of the twelve coal production regions were intended collectively to achieve the national production goals.

The 1979 regulations also established a leasing process, known as leasing-by-application. *See generally* 43 C.F.R. Subpart 3425. Unlike the national program, leasing-by-application was not designed to pursue national energy policy. 1979 PEIS 3-60 (noting that leasing production goals apply only to the regional leasing program). Instead of a coordinated national coal management program, leasing-by-application amounted to little more than a process for reviewing unrelated, individual industry applications to lease coal on an *ad hoc* basis. 43 C.F.R. § 3425.0-2 (the purpose of leasing-by-application "is to provide an application process through which the Department may consider holding lease

sales apart from the competitive leasing process set out in §§ 3420.3 through 3420.5-2 … in areas outside coal productions regions").

Leasing-by-application does not involve Department of Energy production goals, regional sales schedules and targets, or even government selection and offering of tracts. *See* 43 C.F.R. Subpart 3425. However, the lease-by-application process would apply only in the limited areas outside of the designated coal production regions that contain the majority of federal coal reserves. *Id*. § 3425.0-2.

Thus, the Interior Department anticipated that the regional leasing under the national coal management program would be the dominant form of federal coal leasing. Characterizing the regional leasing system as a "Federal coal management program" with "national impacts," 1979 PEIS 1-3, the Interior Department performed a programmatic analysis of the environmental impacts of the national program pursuant to NEPA, 42 U.S.C. §§ 4321 to 4370h. *See generally* 1979 PEIS That programmatic environmental impact statement was part of the Interior Department's two-tiered approach to complying with NEPA, with one tier "to consider interregional and national impacts and one to consider site-specific and cumulative intraregional impacts." *Id*. at 3-68. The first tier programmatic statement was designed to "address the total national demand for coal." *Id*. at 1-5.

Consistent with the top-down approach embraced in the national program, the programmatic analysis was built around the Department of Energy's "coal production projections" out to 1985 and 1990. *Id*. at 2-27. Those projections included high, medium, and low estimates based on different underlying economic assumptions. 1979 PEIS 1-3. Each component of the programmatic analysis, such as air quality and socioeconomic impacts, was built around the Department of Energy's national production projections. *See, e.g.*, *id*. at 5-37, 5-99, 5-109, 5-128.

The programmatic statement nonetheless evaluated alternatives, including "leas[ing] to meet industry indications of needs," or leasing-by-application. *Id*. at v. That approach to coal leasing, the Interior Department observed, would "shift the responsibility … for the final decision on how much and which coal will be offered for lease sale (from the Department to the industry…)." *Id*. at 3-1. Accordingly, the industry-driven, leasing-by-application process "would likely result in coal leasing, coal production, and coal-related development activity levels for each coal region different from those which would occur under the preferred [national] program." *Id*. at 3-2. The Interior Department also noted that the production goals at the core of the national program "are incompatible with the lease to meet industry indications of need alternative, which relies on industry nominations to resolve the question of leasing levels." *Id*. at 3-60. Because industry driven, leasing-by-application was antithetical to the nationally focused regional

leasing program, leasing-by-application was one of the "options not preferred by the Secretary[.]" *Id.* at 3-1.

Unsurprisingly, the Secretary adopted the national program as the Interior Department's "comprehensive coal management program." U.S. Dept. of the Interior, Federal Coal Management Program: Final Environmental Impact Statement Supplement 16 (Oct. 1985) (1985 SEIS), *available at* google.com/books (search for "federal coal environmental impact supplement 1985"). The Interior Department assembled regional coal teams for each coal producing region, which prepared regional environmental impact statements for anticipated leasing levels based on the Department of Energy's production goals. *Id.* at 19; *see also* Wyoming and Montana; Powder River Regional Coal Team Meeting, 46 Fed. Reg. 44,517 (Sept. 4, 1981); Uinta-Southwestern Utah Regional Coal Leasing Environmental Impact Statement, 45 Fed. Reg. 68,468 (Oct. 15, 1980).

### C.   The national program runs into hurdles out of the gate.

The nascent national program faced challenges from the outset. In 1982, the Interior Department revised the program in an effort to encourage more leasing because multiple federal agencies, including the Departments of Energy and Justice, had "concluded that the Department of the Interior was not proposing to lease enough coal." Adjustments to Coal Management Program Regulations, 47 Fed. Reg. 33,114, 33,118 (July 30, 1982). That same year, the Interior Department

held the first coal lease sale under the new program, leasing 1.6 billion tons of coal, the largest lease of federal reserves in history.[2] The Interior Department intended the sale to be "a symbol of the resumption of Federal coal leasing after a decade-long moratorium," and proof that the Department "could implement announced coal leasing plans on a regularly scheduled basis." *Id.* at 88, 89.

The sale immediately led to charges that the Interior Department had received far less than fair market value for the leases. *Id.* at 2. In response, Congress ordered the Interior Secretary to appoint an independent commission to review the new coal leasing program and issue recommendations on how to ensure receipt of fair market value for coal leases. *See* Pub. L. No. 98-63, 97 Stat. 328 (1983). Then, Congress effectively suspended coal leasing under the new program until the fair market value commission, known as the Linowes Commission, submitted its report to Congress. Pub. L. No. 98-146, § 112, 97 Stat. 919, 937 (1983).

The Commission's report identified a number of programmatic problems with the controversial lease sale, including one critically questioning the new leasing program's focus on national energy projections.[3] One of the key reasons for

---

[2] *See* Report of the Commission on Fair Market Value Policy for Federal Coal Leasing 3 (Feb. 1984), *available at* http://babel.hathitrust.org/cgi/pt?id=mdp.39015055347564;view=1up;seq=7.

[3] Both plaintiffs in this case participated in the Commission's proceedings. *See id.* at xv.

the lackluster prices obtained for the leases was that the Interior Department held the largest federal coal sale in history in the midst of a soft coal market. *Id*. at 3. Because that sale comported with the national production goals the leasing program was designed to achieve, the Commission questioned "the feasibility of predicting future coal demands and supplies with the precision [the coal leasing program] assumed." *Id*. at 72. Not seeing a simple solution in a program built around national production goals, the Commission forecast that "there is likely to be a significant lag between coal market changes and the leasing program response." *Id*. at 91.

Though submission of the Commission's report lifted Congress's moratorium on leasing, the Interior Secretary maintained the ban until completion of additional program reviews and revisions. *See* Southern Appalachian Federal Coal Production Region—Alabama Subregion, 52 Fed. Reg. 608, 608 (Jan. 7, 1987) (describing the Secretary's suspension of leasing). In 1986, the Interior Department completed its program revisions in an effort to better ensure receipt of fair market value for coal lease sales and to align the program with environmental policies. Coal Management—General, 51 Fed. Reg. 18,884 (May 23, 1986).

Along with the changes to the program, the Interior Department supplemented the analysis in its 1979 programmatic environmental impact statement. *See generally* 1985 SEIS That supplemental analysis, like the Linowes

Commission Report, began to question the wisdom of a program driven by national energy projections. Noting that the national program "heavily emphasized supply and demand forecasts," *id.* at 74, the Interior Department remarked that, "[a]s events since 1979 have shown, it is difficult to predict accurately how energy users and suppliers would respond to changing energy supplies, new energy and environmental legislation, and changing energy prices. It is similarly difficult to predict to what extent users will either adopt conservation measures and alternative energy sources, or consumers will be willing to change their behavior," *id.* at 73. As a result of the doubts, the Interior Department tellingly forecast that "the Secretary of the Interior may choose to continue the existing program … or he may decide to select … no program at all." *Id.* at 16.

## II.    The Interior Department abandons the national program not long after implementation.

Though the Interior Department reopened leasing after the 1986 program revisions, it received little interest from prospective lessees. In some designated coal regions, the leasing program failed to generate even a single lease sale. *See, e.g.*, Coal Management Program; San Juan River Federal Coal Production Region, 53 Fed. Reg. 44,956, 44,956 (Nov. 7, 1988) (noting that "A regional coal sale … was never held"). In short order, the Interior Department realized that, in the face of so little leasing activity, it could not justify maintaining the massive administrative infrastructure necessary to support the nationally oriented leasing

11

program. *See, e.g.*, Utah, Colorado: Uinta-Southwestern Utah Federal Coal Production Region, 52 Fed. Reg. 48,327, 48,327 (Dec. 21, 1987) ("assessments indicate that industry interest, based on market conditions and existing potential production capacities, does not justify the federally initiated coal lease sale program"); *see also* Public Participation in Coal Leasing, 64 Fed. Reg. 52,239, 52,240 (Sept. 28, 1999).

Accordingly, the Interior Department decertified each of the major coal producing regions. *See, e.g.*, *id.*; 53 Fed. Reg. at 44,956; Southern Appalachian Federal Coal Production Region—Alabama Subregion, 52 Fed. Reg. 608 (Jan. 7, 1987); Cancellation; Fort Union Federal Coal Production Region, 53 Fed. Reg. 13,195 (April 21, 1988); Decertification of the Powder River Coal Production Region, 55 Fed. Reg. 784 (Jan. 9, 1990). Because the nationally oriented leasing program applied only in certified coal production regions, decertification of all of the coal production regions mothballed the leasing program. *See, e.g.*, 53 Fed. Reg. at 13,195 (noting "that lease by application procedures should be used in lieu of the regional activity planning process").

To replace the failed national program, the Interior Department called on the industry-driven, lease-by-application process that had been sidelined in favor of the nationally oriented regional leasing program. *See WildEarth Guardians v. Salazar*, 783 F. Supp. 2d 61, 65 (D.D.C. 2011) (explaining that decertification "had the

effect of replacing the competitive regional leasing process with the leasing-by-application process"). That change, from a unified national leasing program to an *ad hoc* process, represented a substantial shift in the Interior Department's approach to coal leasing. Most broadly, "[t]he leasing-on-application process is initiated by individuals or companies, unlike the regional coal leasing process which is Government initiated." 64 Fed. Reg. at 52,240. As a result, under the lease-by-application process, "[t]here is no need to establish a leasing level because the amount of coal applied for provides the starting point for the amount of coal to be analyzed." *Id*. Similarly, the lease-by-application process, unlike regional leasing in the national program, does not require a "leasing schedule because BLM usually offers coal tracts based on at most one or two applications in leasing-on-application lease sales." *Id*. Even the regional coal teams, which previously oversaw almost every facet of leasing under the national program, were reduced to nothing more than "meeting on an ad hoc basis to advise BLM on lease-on-application coal sales." *Id*.

In short, by replacing the national program with leasing-by-application, the Interior Department did precisely what it foreshadowed just a few years before: replace the "program" with "no program at all." 1985 SEIS at 16. Since decertification of the coal production regions and the consequent suspension of the

program, the Interior Department has "leased Federal coal exclusively through the leasing-on-application process." *Id*.

Because the lease-by-application process does not involve national production goals, which formed the bases of the 1979 programmatic analysis, the BLM cannot rely on the goals as the inputs for environmental analyses. Instead, the BLM utilizes the amount of coal sought in a leasing application to frame the environmental impacts analysis. As a result, the BLM fulfills its NEPA obligations in the lease-by-application process not at the programmatic level, but as leasing applications arise.

For example, in 2009, the BLM completed its cumulative NEPA analysis of four separate lease applications that were pending before the agency.[4] To evaluate the environmental impacts of the proposed leases, the BLM relied on the amount of coal sought under each lease applications rather than a national production goal or regional sales target. *See id*. at ES-10 (Table ES-1) (noting quantities of recoverable coal). Based on those data inputs from the lease applications, the BLM evaluated the potential environmental effects of issuing the proposed leases, including climate change. *Id*. at 4-108 to -122.

---

[4] *See* U.S. Dep't of the Interior, Bureau of Land Mgmt., Final Environmental Impact Statement for the South Gillette Area Coal Lease Applications (Aug. 2009) (Vol. 1), *available at* http://www.blm.gov/pgdata/etc/medialib/blm/wy/information/NEPA/hpdo/south_gillette/feis.Par.57426.File.tmp/vol1.pdf.

The BLM estimated "the amount of GHG emissions that could be attributed to coal production that could result from leasing of the proposed [lease tracts], as well as from the forecast coal production from all mines in the Wyoming [Powder River Basin.]" *Id.* at 4-110. It also established the significance of the leasing actions in relation to overall greenhouse gas emissions and considered the potential risks of climate change, including variations in precipitation, species populations, and the frequency and severity of forest fires. *Id.* at 4-110, -113. The BLM has consistently followed this approach to fulfilling its NEPA obligations in relation to the lease-by-application process.[5] And by using this approach, "the BLM satisfie[s] its obligations under NEPA to consider climate change." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 311 (D.C. Cir. 2013) (upholding the BLM's NEPA analysis of climate change in response to a leasing application process).

## III. The conservation organizations claim the BLM must update the programmatic NEPA analysis for the national program.

On November 24, 2014, the conservation organizations filed suit in this Court. *See* ECF Doc. 1. They claim that NEPA requires the BLM to supplement its 1979 programmatic environmental statement with an analysis of "the effect of greenhouse gas emissions from the mining and combustion of coal extracted under

---

[5] *See, e.g.*, U.S. Dep't of the Interior, Bureau of Land Mgmt., Final Environmental Impact Statement for the West Antelope II Coal Lease Application 4-99 to -110 (Dec. 2008) (Vol. 1), *available at* http://www.blm.gov/style/medialib/blm/wy/information/NEPA/cfodocs/westantelope/feis.Par.7431.File.dat/vol1.pdf

the continuing federal coal management program on global climate and on climate change-related direct and indirect effects." *Id*. at 63, ¶ 189. They allege that the BLM's failure to update the 1979 programmatic statement with an analysis of climate change violates NEPA. *Id*. at 64, ¶ 195. The conservation organizations assert that this alleged failure is arbitrary and capricious and agency action unlawfully delayed or withheld, giving rise to causes of action under the Administrative Procedure Act, 5 U.S.C. § 706. Compl. 65, ¶ 196.

The conservation organizations do not identify or define what they mean by the "federal coal management program," except to say that it "is administered by BLM" and to cite to a collection of statutes, regulations, and guidance. *Id*. at 3, ¶ 3 (citing, inter alia, the Mineral Leasing Act, Federal Coal Leasing Amendments Act, Surface Mining Control and Reclamation Act, Federal Land Policy and Management Act, 43 C.F.R. Parts 3400-3480). Notwithstanding this ambiguity, the conservation organizations allege that the 1979 Programmatic Statement is "the NEPA document that continues to govern the federal coal management program[.]" *Id*. at 63, ¶ 190.

Based on these allegations, the conservation organizations ask this Court to: (1) declare that the Interior Department and the BLM violated NEPA by not updating the 1979 programmatic statement; (2) order the agencies to comply with

16

NEPA; and (3) prohibit the BLM from taking action on any coal lease application until it updates the 1979 programmatic analysis. *Id*. at 65-66.

## ARGUMENT

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether the plaintiff has properly stated a claim upon which relief may be granted." *Ariz. Mining Ass'n v. Jackson*, 708 F. Supp. 2d 33, 39 (D.D.C. 2010). A claim for relief can survive a motion to dismiss under Rule 12(b)(6) only if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). Although plausibility is a lesser standard than probability, the facts alleged in a complaint "must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (quotation omitted). A claim for relief must, therefore, provide more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action[.]" *Iqbal*, 556 U.S. at 678.

The conservation organizations' complaint fails this test. They have not alleged that the Interior Department or the BLM has taken any action under the national coal management program that would obligate either agency to update the 1979 programmatic statement analyzing that program. As a result, even accepted as true, their allegations do not establish a violation of NEPA. Accordingly, this

Court should dismiss the conservation organizations' complaint for failing to state a claim upon which relief may be granted.

## I.   The BLM has no obligation to update the 1979 programmatic statement until it takes action under the program that statement analyzed.

NEPA requires federal agencies to evaluate and publish a statement of the effects of proposed "major Federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(C). NEPA does not dictate any substantive result in agency decision making. *See, e.g.*, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citation omitted). Rather, it merely requires agencies to consider and share with the public the potential impacts of proposed actions. *Id.*

Under NEPA, it can be appropriate for federal agencies to undertake a programmatic analysis when there are "pending concurrently before an agency" multiple proposals that "will have cumulative or synergistic environmental impact[.]" *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976).[6] The regulations implementing NEPA additionally require federal agencies to supplement a past analysis if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40

---

[6] However, the decision whether to undertake a programmatic analysis is highly discretionary. *See Kleppe*, 427 U.S. at 412; *Nat'l Wildlife Fed'n v. Appalachian Reg'l Comm'n*, 677 F.2d 883, 892 (D.C. Cir. 1981). The conservation organizations have not alleged that the federal agency defendants have arbitrarily exercised this discretion. *See generally* ECF Doc. 1.

C.F.R. § 1502.9(c)(1)(ii). But, as the rule makes clear, supplementation comes into play only where new circumstances or information implicate a "proposed action or its impacts." *Id.*; *see also Fla. Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs*, 374 F. Supp. 2d 1116, 1146 (S.D. Fla. 2005).

## A. The 1979 programmatic statement analyzed the regional leasing program as the proposed major federal action.

The Interior Department repeatedly made it clear that the proposed action evaluated in the 1979 programmatic statement was the regional leasing program. *See, e.g.*, 1979 PEIS at v (describing the regional leasing program as the "preferred alternative"); *see also id.* at 3-1. Throughout the analysis, the Interior Department described the regional leasing program as the "Federal coal management program[.]" *See, e.g., id.* at 1-3. Thus, the Interior Department based its 1979 environmental analysis on the national coal production goals that were the focal point of the regional leasing program. *See, e.g., id.* at 5-37, 5-99, 5-109, 5-128. Those national production goals provided the baselines for estimating environmental impacts that would flow from the Interior Department's proposed national program. *Id.* Because the program was devoted to achieving national coal production goals, it was entirely sensible, if not legally required, for the Interior Department to evaluate the environmental impacts at the programmatic level. *Kleppe v. Sierra Club¸* 427 U.S. at 410, 412.

By contrast, the Interior Department did not identify leasing-by-application as the preferred alternative for the proposed action. Progr. Stmnt. 3-1. Indeed, the Interior Department explained that the leasing-by-application process "would likely result in coal leasing, coal production, and coal-related development activity levels for each coal region different from those which would occur under the preferred program." *Id.* at 3-2. That, too, was sensible because the Interior Department intended the regional leasing program to be the norm and the leasing-by-application process the exception.

### B.   The BLM has not taken any action under the regional leasing program.

The BLM has not taken any significant action under the regional leasing program since it decertified the coal production regions more than two decades ago. 64 Fed. Reg. at 52,240. Nor has the BLM proposed any action under that program. Since decertification, the BLM has competitively leased coal exclusively through the market-driven lease-by-application process. *Id*. Under that *ad hoc* process, coal leasing activities do not implicate the 1979 programmatic statement, which evaluated the impacts of the defunct regional leasing program.[7]

_____

[7] The BLM has recognized that its ad hoc actions under the lease-by-application process can sometimes require the agency to analyze cumulatively the effects of multiple proposals before the agency and has done so where appropriate. *See, e.g.*, U.S. Dep't of the Interior, Bureau of Land Mgmt., Final Environmental Impact Statement for the South Gillette Area Coal Lease Applications (Aug. 2009) (cumulatively analyzing the environmental impacts of multiple pending lease

In essence, the conservation organizations' claim depends on characterizing the lease-by-application process and the regional leasing program collectively as "the federal coal management program." ECF Doc. 1 at 2, § 1. But, when the Interior Department created "the federal coal management program," it used that term to refer only to the regional leasing process. Progr. Stmnt. 1-3. The agency made abundantly clear that the lease-by-application process was not the federal coal management program. *Id*. at 3-1.

The conservation organizations' failure to define the "program" in any meaningful sense is telling. Their most detailed explanation of the program is nothing more than a laundry list of legal authorities related to coal leasing: It "is administered by BLM, an agency within the Department of the Interior, according to various acts of Congress, including the Mineral Leasing Act of 1920, 30 U.S.C. § 181 *et seq*.; Federal Leasing Amendments Act of 1976, Pub. L. No. 94-377, 90 Stat. 1083; Surface Mining Control and Reclamation of 1977, 30 U.S.C. § 1201 *et seq*.; and Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1701 *et seq*." ECF Doc. 1 at 3, ¶ 3. To this, the conservation organizations add that "BLM

---

applications), *available at* http://www.blm.gov/pgdata/etc/medialib/blm/ wy/information/NEPA/hpdo/south_gillette/feis.Par.57426.File.tmp/vol1.pdf; Powder River Federal Coal Production Region, WY; Coal Lease Application, 61 Fed. Reg. 64,919, 64,920 (Dec. 9, 1996) ("The BLM has determined that the EIS will include an updated analysis of the cumulative impacts of coal mining in the southern group of mines in the Wyoming Powder River Basin, so that the cumulative impacts of mining the previously issued leases and the applied-for tracts in this area can be fully disclosed as required by NEPA.").

has promulgated regulations implementing the Program at 43 C.F.R. Parts 3400-3480 and issued guidance supplementing these regulations, *see, e.g.*, BLM Handbook H-3070-1, Economic Evaluation of Coal Properties." *Id.*

The conservation organizations' all encompassing "federal coal management program" is no more a program "than a 'weapons procurement program' of the Department of Defense or a 'drug interdiction program' of the Drug Enforcement Administration." *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990) (rejecting argument to characterize individual agency actions as a collective program). The sheer breadth of the regulatory activities embraced in the legal authorities that the conservation organizations claim constitute the "program" belies the existence of any program whatsoever. *See, e.g.*, 43 U.S.C. § 1752(a) (establishing under FLPMA the terms for grazing leases on BLM lands); 30 U.S.C. § 1253 (authorizing state regulatory programs under the Surface Mining Control and Reclamation Act).[8]

True, these authorities relate to the Interior Department's and the BLM's coal leasing activities. And to differing degrees and for varying reasons some of these authorities spurred the Interior Department to create the regional leasing

---

[8] If, as the conservation organizations suppose, all of the cited statutory authorities for the federal defendants' coal leasing activities collectively constitute a "program," they also should have cited in their definition of the "program" the Small Business Act of 1953, 15 U.S.C. § 631. *See* 43 C.F.R. § 3420.0-3 (explaining that part of the coal leasing regulations implement the Small Business Act of 1953).

program. But, due to decertification, they do not collectively constitute any sort of coal management program in operation today. *See Nat'l Wildlife Fed'n v. Appalachian Reg'l Comm'n*, 677 F.2d 883, 890 (D.C. Cir. 1981) ("a once vast and variegated program can become reduced to a few uncompleted, smaller-scale enterprises"). As a result, the "program" is "simply the name by which [the conservation organizations] have … referred to the continuing (and thus constantly changing) operations of the BLM." *Lujan*, 497 U.S. at 890.

> **C. Because the BLM has not taken action under the national coal management program, the agency has no obligation to update the 1979 environmental analysis of the program.**

Congress made clear that federal agencies are obligated to comply with NEPA only when faced with a proposed "major Federal action[.]" 42 U.S.C. § 4332(C). And the regulations implementing NEPA unequivocally state that an agency is obligated to supplement a NEPA analysis only where new information bears "on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). Until the BLM or the Interior Department proposes an action under the national coal management leasing program, neither agency is under any obligation to revise the 1979 programmatic evaluation of the program. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989) (an agency's obligation to supplement a NEPA analysis arises only if "there remains major Federal action to occur"); *see also Kleppe*, 427 U.S. at 406 (an agency's NEPA obligation arises when "it makes a

recommendation or report on a *proposal* for federal action") (quotation omitted) (emphasis in original).

In fact, updating the 1979 programmatic statement to consider climate change impacts would be a frivolous exercise. The 1979 programmatic statement relied on the national coal production goals that guided regional leasing to establish the environmental effects analyzed. *See, e.g.*, 1979 PEIS 5-37, 5-99, 5-109, 5-128. Because the government dictated how much coal would be leased, where, and when under the national coal management program, the Interior Department could programmatically evaluate the impacts of the national program. But, because the Interior Department shelved that program in favor of the industry driven, *ad hoc* lease-by-application process, there are no national coal production goals to form the "factual predicate" for a supplemental NEPA analysis. *Kleppe*, 427 U.S. at 402.

In other words, absent a proposal for action under the national coal management leasing program, "there is nothing that could be the subject of the analysis envisioned by the statute for an impact statement." *Id*. at 401; *see also Young v. Gen. Servs. Admin.*, 99 F. Supp. 2d 59, 72 (D.D.C. 2000) ("agencies don't just go out and do NEPA just to do NEPA") (citation omitted). Because total coal production under the lease-by-application process depends on industry interest, not national production goals, the Department cannot reasonably be expected to

hypothesize the total national coal production estimates to replace the production goals in the 1979 programmatic statement. *Cf. Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 668 (9th Cir. 1998) ("NEPA does not require an agency to consider the environmental effects that speculative or hypothetical projects might have on a proposed project") (citation omitted). Indeed, the government's inability to predict accurately the market for coal proved to be the national program's Achilles heel.

## II.   Because BLM has no present obligation to update the 1979 programmatic statement, the conservation organizations have failed to state a claim upon which relief may be granted.

Even accepting as true the factual allegations in the conservation organizations' complaint, those facts are not "enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555-56 (2007). The conservation organizations have not alleged that the Department or the BLM have taken any action under the national coal management program that would trigger a NEPA obligation to revisit the 1979 programmatic analysis of the program. *See generally* ECF Doc. 1. Their claim for relief depends on an erroneous collective characterization of the United States' coal leasing activities as a "program" that finds no support in the law or the regulatory history. As a result, their complaint alleges little more than "labels and conclusions" coupled with a "formulaic recitation of the elements of a cause of action[.]" *Iqbal*, 556 U.S. at 678. And because the conservation organizations have failed to allege a claim upon which

the Court may grant relief, the Court should dismiss their claim. *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, --- F. Supp. 2d ---, No. 13-cv-1239-KBJ, 2014 WL 4066256 at *7 (D.D.C. Aug. 18, 2014) (granting 12(b)(6) motion to dismiss NEPA claim where agency has not taken an action to trigger its NEPA obligation).

## CONCLUSION

This litigation is the most recent in a long line of cases attempting to put an end to the development of federal coal reserves. *See, e.g.*, *WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013); *WildEarth Guardians v. BLM*, 8 F. Supp. 3d 17 (D.D.C. 2014). Like others before it, this case is "less a challenge to a discrete action taken by the BLM [or the Interior Department] than a challenge to the BLM's [and the Interior Department's] broader policy decision to phase out coal production regions … and to conduct its federal coal leasing program pursuant to the leasing-by-application process going forward." *WildEarth Guardians v. Salazar*, 783 F. Supp. 2d 61, 68 (D.D.C. 2011).

The conservation organizations' cumulative dissatisfaction with federal coal leasing does not entitle them to "seek *wholesale* improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Lujan*, 497 U.S. at 891 (emphasis in original). So long as the BLM and the Interior Department utilize the leasing-by-application process, evaluating environmental impacts based on actual

leasing application proposals satisfies the agencies' "obligations under NEPA to consider climate change." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 322 (D.C. Cir. 2013).

WHEREFORE, this Court should grant Wyoming's motion and dismiss the conservation organizations' claim with prejudice.

Submitted this 30th day of January 2015.

/s/ Jeremiah I. Williamson
Michael J. McGrady (Wyo. State Bar No. 6-4099)
Jeremiah I. Williamson (Wyo. State Bar No. 7-4748)
Wyoming Attorney General's Office
123 State Capitol
Cheyenne, Wyoming 82002
(307) 777-6946
(307) 777-3542 *facsimile*
mike.mcgrady@wyo.gov
jeremiah.williamson@wyo.gov
*Attorneys for Intervenor-Defendant*
*State of Wyoming*